# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**MICKEY OECHSNER**
            **Plaintiff,**

        **v.**                                        **Case No. 23-C-56**

**KILOLO KIJAKAZI,**
**Acting Commissioner of the Social Security Administration**
            **Defendant.**

---

## DECISION AND ORDER

Under the Social Security Act, a person will be deemed disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); see Barnhart v. Walton, 535 U.S. 212, 219-20 (2002) (upholding the agency's longstanding statutory interpretation that the inability to engage in work, not just the impairment, must last the required 12-month period). The Social Security Administration has devised a five-step test for determining disability. 20 C.F.R. § 404.1520(a)(4).

At the first step, the agency considers the claimant's work activity, if any. If the claimant is doing substantial gainful activity ("SGA"), the agency will find that she is not disabled, regardless of her medical condition. 20 C.F.R. §§ 404.1520(a)(4)(i), (b). At the second step, the agency determines whether the claimant suffers from a "severe" medically determinable physical or mental impairment. If not, she will be found not disabled. 20 C.F.R. § 404.1520(a)(4)(ii). If so, the agency determines, at step three, whether any of the claimant's

impairments meet or equal the severity of one of the presumptively disabling conditions listed in the regulations, i.e., the "Listings." If so, she will be deemed disabled. 20 C.F.R. § 404.1520(a)(4)(iii). If not, the inquiry moves to step four, at which the agency determines whether the claimant can, given her residual functional capacity ("RFC"), perform her past relevant work. If so, she will be found not disabled. 20 C.F.R. § 404.1520(a)(4)(iv). If not, the inquiry moves to the fifth and final step, where the agency determines whether the claimant can, given her RFC, age, education, and work experience, make an adjustment to other work. If so, she is not disabled; if not, she is disabled. 20 C.F.R. § 404.1520(a)(4)(v).

In this case, plaintiff Mickey Oechsner applied for disability benefits, alleging that she became disabled as of May 9, 2020, due to kidney disease, diabetes, obesity, and other impairments. Plaintiff received a kidney transplant in April 2019, and under the Listings a person suffering from chronic kidney disease will be deemed disabled for one year following a transplant, after which the agency will evaluate her residual impairment(s) by considering her post-transplant function, any rejection episodes she has had, complications in other body systems, and any adverse effects related to ongoing treatment. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 6.04.

However, the agency declined to apply Listing 6.04 in this case, observing that plaintiff returned to work in August 2019 and continued employment at the SGA level until May 2020. The agency further determined that, after May 2020, plaintiff remained capable of full-time work. Plaintiff requested a hearing, but the Administrative Law Judge ("ALJ") assigned to the case concluded that following her alleged onset date plaintiff retained the RFC for a range of full-time, sedentary work, consistent with one of her past jobs and several other occupations existing in significant numbers in the economy.

2

Plaintiff now seeks judicial review of the denial, primarily arguing that the ALJ should have applied Listing 6.04 and then treated her resumption of employment as a "trial work period." The purpose of a trial work period is to permit a disabled person to test her ability to work without risking a finding that her disability has ended. Tumminaro v. Astrue, 671 F.3d 629, 633 (7th Cir. 2011). Work performed after a claimant becomes entitled to benefits will be characterized as part of a trial period until such time as she has tallied nine months of "service" (whether consecutive or not) over a 60-month period. Id. (citing 20 C.F.R. § 404.1592(e)). During this trial period, the agency will not consider the work as evidence that the claimant is no longer disabled (although it may rely on other evidence to reach that conclusion). Id. (citing 20 C.F.R. §§ 404.1592(a), (e)). Once the trial period is over, the agency may look back at the work performed during that time in assessing whether the disability ended at some point after the trial work period. Id. (citing 20 C.F.R. § 404.1592(a)).

However, a claimant is not entitled to a trial work period for any month prior to the month she applied for disability benefits. 20 C.F.R. §§ 404.1592(d)(2)(iv), (e). Here, plaintiff returned to work from August 2019 to May 2020, and she applied for benefits in June 2020. Accordingly, she was not entitled to a trial work period as a matter of law. Plaintiff raises a number of other challenges to the ALJ's RFC determination, but none has merit. I therefore affirm the denial of her application and dismiss this action.

## I. FACTS AND BACKGROUND

### A. Plaintiff's Application and Agency Decisions

Plaintiff applied for benefits on June 15, 2020, alleging a disability onset date of May 9, 2020. (Tr. at 177.) In a disability report, she listed impairments of type 1 diabetes, myocardial

3

infarction in 2010, coronary artery disease with stenting in 2010 and 2011, kidney transplant in 2019, cyclic vomiting syndrome in 2020, hypertension, hyperlipidemia, and anxiety. (Tr. at 197.) In a function report, plaintiff wrote that she needed frequent breaks due to fatigue, experienced frequent shortness of breath affecting her ability to complete work tasks, and could not stand/walk for extended periods of time. (Tr. at 209.) She reported difficulty dressing and bathing due to shortness of breath. (Tr. at 210.) She could prepare simple meals, do dishes, drive a car, and grocery shop with her husband. (Tr. at 211-212.) She reported that her impairments affected her ability to lift, stand, walk, and climb stairs. She indicated she could not lift more than 30 pounds, stand over 20 minutes, or walk over 50 yards without a break. She could pay attention for 30 minutes and followed written and spoken instructions well. (Tr. at 214.) She got along well with authority figures, but did not handle stress or changes in routine well. (Tr. at 215.) In a physical activities addendum, plaintiff reported that she could continuously sit for one hour, stand for 20 minutes, and walk for 20 minutes, and in a day sit for eight hours, stand one hour, and walk one hour. (Tr. at 217.)

The agency sent plaintiff for a consultative mental status evaluation, completed by John Juern, Ph.D., on August 28, 2020. Dr. Juern first interviewed plaintiff's husband, who detailed her health issues related to diabetes, chronic nausea/vomiting, and kidney failure. (Tr. at 1028-29.) When Dr. Juern spoke to plaintiff, she believed the assessment would relate to her physical condition. (Tr. at 1030.) Asked why she applied for disability benefits, plaintiff mentioned diabetes, which she had since age 13, and kidney disease, with a transplant in 2019. She stated that her most difficult condition was chronic vomiting syndrome, the symptoms of which she had experienced since 2009 but which worsened since the transplant. (Tr. at 1031.) She was hopeful that a new medication would relieve the vomiting symptoms.

4

Dr. Juern stated that plaintiff had a number of physical conditions, which prevented her from working and caused anxiety. He was also concerned about cognitive decline, although this could not be ruled in as a diagnosis. He concluded:

> The prognosis for Mickey is very challenging. At the present time she has significant physical problems, which prevent her from working. If those physical issues could be better resolved, it is felt she would be able to return to work. But, at the present time, the examiner would not see that she would be capable of working. On the positive side, Mickey does have access to healthcare and seems to be receiving very appropriate healthcare for all of the physical difficulty she is having.

(Tr. at 1034.)

On September 8, 2020, agency psychological consultant Kyla Holly, Psy.D., found plaintiff's mental impairments non-severe, causing no or only mild impairments in the pertinent areas of functioning. (Tr. at 83, 94-95.) On September 18, 2020, an agency medical reviewer, David Braverman, M.D., proposed that plaintiff be awarded a closed period of benefits from April 17, 2019 (the date of her transplant) to April 17, 2020 under Listing 6.04, further opining that from April 18, 2020 onward she had the RFC for a reduced range of light work. (Tr. at 81-82, 84-85, 87.)

However, on September 25, 2020, the agency issued a "request for corrective action," noting that plaintiff could not meet Listing 6.04 from April 17, 2019 to April 17, 2020 because she continued to work at the SGA level until May 9, 2020. (Tr. at 219; see also Tr. at 77, 82, 88, 93.) The agency further determined that the previous review did not sufficiently address plaintiff's ability to sustain work. The agency accordingly returned the matter for additional development sufficient to assess the nature and extent of all of plaintiff's alleged physical impairments. (Tr. at 221.)

On October 22, 2020, medical consultant Pat Chan, M.D., found plaintiff capable of a

5

reduced range of light work: lifting 20 pounds occasionally and 10 pounds frequently, standing/walking two hours in an eight-hour day, and sitting about six hours in an eight hour day, with no other limitations. (Tr. at 96-97.) The agency then denied the claim on October 29, 2020. (Tr. at 100, 110.)

Plaintiff requested reconsideration in December 2020 (Tr. at 101, 114), completing another function report in May 2021 (Tr. at 246). She reported that she got very fatigued during work, and that she could not walk or stand for long periods of time. (Tr. at 246.) She further reported that she prepared sandwiches and frozen dinners, and did dishes, laundry and cleaning, but could not stand for long. (Tr. at 248.) Her hobbies included watching TV and reading, and she went out to attend church and sporting events for her nieces and nephews. (Tr. at 250.) She reported that her impairments affected her ability to lift, stand, walk, see, and concentrate. She could lift a gallon of milk and walk for 50 yards. (Tr. at 251.) She followed instructions and got along with authority figures well, but did not handle stress or changes in routine well. (Tr. at 251-52.)

On June 11, 2021, the agency denied reconsideration. (Tr. at 109, 115.) Marcia Lipski, M.D., found that plaintiff could occasionally lift/carry 10 pounds and frequently lift/carry one to five pounds, stand/walk two hours, and sit about six hours during an eight-hour workday; occasionally balance, stoop, kneel, crouch, and crawl; and needed avoid even moderate exposure to hazards. (Tr. at 105-06.) John Edwards, Ed.D., found that plaintiff's mental impairments caused mild limitations and were thus non-severe. (Tr. at 104.) Plaintiff then requested a hearing before an ALJ. (Tr. at 125.)

**B. Medical Evidence**

The agency collected plaintiff's medical records, which documented her kidney transplant

6

on April 17, 2019. She discharged from the hospital on April 23 but thereafter struggled with nausea and vomiting, leading to re-admissions on April 29 and May 17. (Tr. at 397, 466, 488, 542.) Notes from May and June 2019 documented significant weight loss, dropping from 253 pounds prior to the transplant to around 210 pounds. (Tr. at 467, 523, 573.) Plaintiff continued to struggle with nausea and vomiting for much of that year, with emergency room visits in August, September, and October (Tr. at 388, 395), and a hospitalization in November (Tr. at 386). On November 20, 2019, plaintiff's primary care physician, Dr. Punit Kumar, started her on new medications (Tr. at 387), and during a January 14, 2020, follow up plaintiff reported that the medications helped, and Dr. Kumar indicated her frequent nausea/vomiting was well controlled (Tr. at 378-79). Although she had returned to work (Tr. at 383), Dr. Kumar stated that, given her various conditions, "I do believe that she is permanently and completely disabled. I do believe that she should apply for disability benefits through [the] Social Security Administration." (Tr. at 379.)

Plaintiff was hospitalized for three days in February 2020 with intractable nausea and vomiting, which providers related to diabetic gastroparesis (Tr. at 376), and again from May 10 to May 20, 2020, with nausea and vomiting (Tr. at 362). On May 27, 2020, she followed up with Dr. Kumar, who stated: "I believe she is completely disabled." (Tr. at 368.)

On June 3, 2020, plaintiff saw Dr. Kevin Patel at the UW Digestive Health Center for management of her nausea and vomiting. (Tr. at 407-08.) Dr. Patel found that her history was not consistent with gastroparesis, more likely cyclic vomiting syndrome ("CVS"). He recommended Amitriptyline, which he would coordinate with Dr. Kumar. (Tr. at 412.) On June 10, 2020, Dr. Kumar started plaintiff on Amitriptyline. (Tr. at 369.) He stated, at that time, "I believe she is completely disabled due to multiple medical problems and frequent

7

hospitalization." (Tr. at 375.)

On July 8, 2020, plaintiff reported doing well on Amitriptyline. (Tr. at 1044.) On exam, Dr. Kumar noted no edema in her extremities. (Tr. at 1048.) He increased her Amitriptyline dose and provided a work excuse for one month. (Tr. at 1049.)

On August 8, 2020, plaintiff followed up with Dr. Patel regarding her CVS. Dr. Patel noted a five-year history of intermittent nausea/vomiting, which worsened the previous year, with acute episodes every four to six weeks, lasting four to five days, with numerous ER visits and hospital admissions. Dr. Patel further noted that plaintiff had previously been given a diagnosis of gastroparesis, but he found her history inconsistent with this, more likely cyclic vomiting syndrome. She reported no episodes of nausea/vomiting since starting Amitriptyline, tolerating the medication well, aside from mild drowsiness. (Tr. at 1083.) Dr. Patel recommended keeping her at the current dose and monitoring symptoms, considering an increase if the symptoms recurred. (Tr. at 1088.)

On August 10, 2020, Dr. Kumar noted that plaintiff's nausea and vomiting were controlled well. Plaintiff denied pain, shortness of breath, nausea, vomiting, or diarrhea (Tr. at 1051), and on exam Dr. Kumar noted no edema in the extremities (Tr. at 1055). He concluded that all chronic conditions were stable and continued medications at the same dose. (Tr. at 1058.)

On October 1, 2020, plaintiff saw Dr. Barbara Peschong, reporting that she was doing well with the kidney transplant and denying shortness of breath or problems with CVS. (Tr. at 1059-61.) On exam, Dr. Peschong noted plaintiff's extremities were within normal limits (Tr. at 1062) and recommended regular exercise and vitamins (Tr. at 1062).

On October 13, 2020, plaintiff followed up with Jennifer Turk, APNP, at the UW

8

transplant center.  (Tr. at 1074.)  Plaintiff reported feeling well since the last visit, with no hospitalizations.  She denied headaches, dizziness, visual changes, nausea, and vomiting.  Ms. Turk noted plaintiff's breathing was comfortable, she had no edema (Tr. at 1075), and muscle tone was normal (Tr. at 1238).

On November 11, 2020, Dr. Kumar noted: "She has not had any bad nausea or vomiting episode[s] in last several weeks.  She has not gone to ER recently. . . . Overall things are good."  (Tr. at 1139.)  Plaintiff denied shortness of breath, nausea, vomiting, and weight loss or gain, and her sleep and appetite were good.  (Tr. at 1139.)  On exam, Dr. Kumar noted no edema of the extremities.  (Tr. at 1143.)  He concluded that her cyclical vomiting was stable, continuing Amitriptyline.  (Tr. at 1146.)

On November 25, 2020, after testing positive for COVID-19, plaintiff reported feeling fair, with shortness of breath, fatigue, and cough.  (Tr. at 1226.)  She received Bamlanivimab treatment at that time.  (Tr. at 1224, 1226, 1228.)

On March 15, 2021, plaintiff saw Dr. Irina Ionova, noting that, overall, she was doing well, recovering from a recent bout of pneumonia.  She had no significant shortness of breath, and no GI complaints.  She did report warts on her hand, which she wanted removed.  (Tr. at 1160.)  Dr. Ionova noted no edema in the extremities.  (Tr. at 1165.)  Plaintiff's cyclic vomiting syndrome was well controlled on Amitriptyline.  (Tr. at 1168.)

On March 16, 2021, plaintiff saw Amy Burmesch, PA-C, for evaluation of poorly controlled diabetes, reporting mild neuropathy symptoms.  (Tr. at 1565.)  Her vomiting was well controlled.  (1565.)  She had a history of poorly controlled diabetes, using enormous amounts of insulin.  (Tr. at 1570.)  She continued to have reasonable renal function, but they discussed the importance of improving glycemic control, and Ms. Burmesch added Metformin.  (Tr. at

9

1571.)

On April 21, 2021, plaintiff followed up with Ms. Turk, feeling well since their last visit, with no hospitalizations. Ms. Turk noted plaintiff's breathing was comfortable, with no nausea/vomiting or edema, and normal muscle tone. Her blood sugars had been running a little high. (Tr. at 1210, 1216.) On June 14, 2021, Ms. Burmesch adjusted plaintiff's medications, adding Trulicity. (Tr. at 1583, 1587.) On July 22, 2021, plaintiff reported: "I have been nauseous and had some vomiting, not much, a couple days here and there." (Tr. at 1452.) On September 22, 2021, plaintiff reported her sleep apnea had improved with a CPAP, her excessive daytime sleepiness resolved. (Tr. at 1556.)

On September 29, 2021, plaintiff underwent a kidney biopsy due to elevated creatinine levels. (Tr. at 1286, 1296.) She reported doing well since the last visit, denying shortness of breath, nausea or vomiting, or lower extremity edema (Tr. at 1288), and the provider noted no lower extremity edema on exam (Tr. at 1294).

On October 6, 2021, plaintiff followed up with Ms. Burmesch, her A1C down from the last visit. Her recent kidney biopsy was negative for rejection. (Tr. at 1595.) On exam, Ms. Burmesch noted proximal muscle atrophy. (Tr. at 1599.) She indicated that they had achieved some degree of improvement in glycemic control, and that plaintiff's deterioration in renal function was likely in part due to poor glycemic control. (Tr. at 1599.)

## C. Hearing

On November 1, 2021, the ALJ convened a telephonic hearing, at which plaintiff was represented by counsel. The ALJ also called a vocational expert ("VE") to offer testimony on jobs plaintiff might be able to do. (Tr. at 42.)

Prior to taking testimony, plaintiff's counsel argued that she would meet Listing 6.04

10

based on her April 2019 kidney transplant. She returned to work from August 2019 to May 2020, a total of nine months, but counsel argued that was a trial work period. (Tr. at 48.) He further argued that her conditions had worsened since the transplant, with a hospitalization for 11 days in May 2020, equivalent in severity to the criteria of Listing 6.09 (requiring three hospitalizations of two days or more). (Tr. at 49.)

Plaintiff testified that she stood 5'7" tall and weighed 275 pounds. She last worked on May 9, 2020, at the Michael's Corporation. (Tr. at 50.) She testified that she was terminated on July 9, 2020, after her FMLA leave ended. (Tr. at 51.) She reported previously working as a bank teller from 2006 to 2008, customer service representative from 2009 to 2017, and as a compliance assistant (at the Michael's Corporation) from 2018 to 2020. (Tr. at 51-52.)

Plaintiff testified that she could no longer work due to shortness of breath, fatigue, and swelling in her feet and ankles. (Tr. at 52.) Physical activity caused shortness of breath; her providers had not identified the cause and she was not receiving any treatment for that condition, although she planned to see her cardiologist later that month, for the first time since the transplant. (Tr. at 53.) She took Plavix and aspirin for her heart condition. (Tr. at 54.) She also reported fatigue during the day, despite getting enough sleep at night, with daily naps. Her providers suspected the fatigue was related to her diabetes, which had not been under good control since the transplant. (Tr. at 54.) Her A1C had improved recently due to a change in medication, more physical activity, and a healthier diet. (Tr. at 55.)

Plaintiff further testified to swelling in her feet and ankles, caused by being on her feet too long, for which she elevated her feet five to six times per day for 15-20 minutes. She wore compression stockings if she could not elevate her legs, including when she was working. (Tr. at 57, 66-67.) She was not on medication for swelling (Tr. at 57), and she had no specific

11

treatment for fatigue (Tr. at 58).

Plaintiff testified that on a typical day she got up, had breakfast, watched TV, had lunch, took a nap, read, helped her husband make supper, then watched TV until bedtime. (Tr. at 58.) It took her longer to tend to personal care, she rarely cooked, and she occasionally did dishes or laundry; her husband did the cleaning. She shopped using a motorized scooter. (Tr. at 59.) Her driving was very limited. (Tr. at 60.)

Plaintiff testified that she also had cyclic vomiting syndrome, with episodes occurring three to four times per month after the transplant. Following a change in medication, it happened less often, maybe once per month. (Tr. at 61-62.) She last went to the hospital due to dehydration the previous December. (Tr. at 67.) She agreed that her medication had made this condition better; she last had an episode of vomiting in December. (Tr. at 68-69.)

Plaintiff further testified that her medications caused weight gain and anxiety. She did not leave the house often because of her immunosuppressants. (Tr. at 63.) She also noticed some cognitive decline, with difficulty concentrating, focusing, and remembering, which occurred frequently but was "not too bad." (Tr. at 65.) She had not spoken to her doctors about this. (Tr. at 69.) She also had sleep apnea, for which she used a CPAP machine, which helped her sleep but had not alleviated her fatigue. (Tr. at 65-66.)

The VE classified plaintiff's past work as teller, light generally and medium as performed, and personnel clerk, sedentary generally and light as performed. (Tr. at 71.) The ALJ then asked a hypothetical question, assuming a person limited to light work, with occasional climbing and postural movements and avoiding hazards such as unprotected heights, moving mechanical parts, and operating a motor vehicle. (Tr. at 71.) The VE testified that such person could perform plaintiff's past job as a teller (as generally performed) and personnel clerk (as

12

generally and actually performed). (Tr. at 71-72.) The person could also perform other jobs, such as marker, checker 1, and classifier. (Tr. at 72.) Reducing the exertional level to sedentary, the person could work as a personnel clerk (as generally performed) or a document preparer, ink printer, and hand mounter. (Tr. at 72-73.) The VE testified that if the person had to elevate her legs to chest level as needed, that would be work preclusive. He further explained that employers tolerate no more than one absence per month and an off task rate of no greater than 10%. (Tr. at 74.)

**D.    ALJ's Decision**

On March 4, 2022, the ALJ issued an unfavorable decision. (Tr. at 15.) At step one, the ALJ determined that plaintiff had not engaged in substantial gainful activity since May 9, 2020, the alleged onset date. (Tr. at 20.) At step two, he determined that she had the severe impairments of diabetes, hypertension, status post kidney transplant, chronic kidney disease, coronary artery disease, status post myocardial infarction, cyclic vomiting syndrome, obesity, and obstructive sleep apnea. He found her diabetic retinopathy and neuropathy, depressive disorder, and anxiety disorder non-severe. However, he noted that he considered all impairments, even those not severe, in determining RFC. (Tr. at 21.)

In considering the alleged mental impairments, the ALJ found "mild" limitations in each of the four broad areas of functioning: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (Tr. at 22-23.) In making finding, the ALJ found persuasive the June 2021 opinion from Dr. Warren, making consistent findings, and somewhat persuasive the September 2020 opinion from Dr. Holly finding mild limitations in the first and third areas but no limitations in the second and fourth. (Tr. at 23.) The ALJ also considered the August 2020 consultative

13

evaluation by Dr. Juern, who concluded that plaintiff's physical problems prevented her from working at that time. (Tr. at 23-24.) The ALJ found this opinion unpersuasive because it was conclusory, inconsistent with and unsupported by the evidence of record, and based primarily on plaintiff's physical impairments, outside Dr. Juern's area of expertise. (Tr. at 24.)

At step three, the ALJ determined that none of plaintiff's impairments met or equaled a Listing. As is pertinent to this appeal, the ALJ considered plaintiff's:

> kidney impairments under the various sections of listing 6.00 (Genitourinary Disorders – Adult). During the period under review, the evidence supports the conclusion that the claimant's impairments do not satisfy the criteria of any of the sections of the listing. The claimant's kidney condition is discussed further below.

(Tr. at 25.) The ALJ also acknowledged that obesity may have an adverse impact on other impairments and indicated that plaintiff's weight, including the impact on her ability to ambulate as well as her other body systems, had been considered in the RFC. (Tr. at 25-26.)

Prior to step four, the ALJ found that plaintiff had the RFC to perform sedentary work, with occasional climbing and postural movements, and avoiding hazards such as unprotected heights, moving mechanical parts, and operating a motor vehicle. In making this finding, the ALJ considered plaintiff's alleged symptoms and the medical opinion evidence. (Tr. at 26.)

In evaluating plaintiff's symptoms, the ALJ acknowledged the required two-step process, under which he had to first determine whether plaintiff had an impairment that could reasonably be expected to produce her symptoms. Second, once such an impairment had been established, he had to evaluate the intensity, persistence, and limiting effects of plaintiff's symptoms to determine the extent to which they limited her ability to do work-related activities. (Tr. at 26.)

In her initial disability report, plaintiff alleged disability due to diabetes, coronary artery

14

disease, kidney transplant, cyclic vomiting syndrome, hypertension, hyperlipidemia, and anxiety. She alleged symptoms including shortness of breath, fatigue, frequent episodes of nausea and vomiting, swelling of the feet and ankles, cognitive decline, and feelings of depression and anxiety. (Tr. at 26.) She further alleged limitations in walking, standing, sitting, climbing stairs, remembering and focusing, handling stress and changes in routine, and overall performance of daily activities. (Tr. at 26-27.) At the hearing, plaintiff testified to symptoms including shortness of breath, fatigue, episodes of nausea and vomiting, swelling of the feet and ankles, and cognitive decline. She indicated that her episodes of nausea and vomiting occurred monthly, lasting anywhere from a day to a week. She further testified that her swelling symptoms required that she elevate her legs multiple times on a daily basis. She also alleged limitations in walking, standing, sitting, climbing stairs, remembering and focusing, and in cognitive functioning generally. She indicated that she required assistance from her husband to perform some activities, with her husband performing other activities himself. She reported treatment modalities including a 2019 kidney transplant, prior dialysis, prior cardiovascular stents, hospitalizations for symptoms including dehydration, and physical therapy. She further testified to being prescribed a number of medications and using compression stockings, a lift chair at home, and a motorized scooter while shopping. She reported medication side effects including immunosuppression and weight gain, and alleged that her condition overall was worsening. (Tr. at 27.)

The ALJ determined that, while plaintiff's impairments could reasonably be expected to cause the alleged symptoms, plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely consistent with the medical evidence and other evidence in the record. In support of this finding, the ALJ first reviewed the medical

15

evidence.  (Tr. at 27.)

Plaintiff had been assessed with cyclic vomiting syndrome, with reports of intractable nausea and vomiting following her renal transplant.  In May 2020, she was hospitalized for 10 days with symptoms of nausea and vomiting with elevated blood sugar.  (Tr. at 27.)  Doctors thereafter recommended treatment with Amitriptyline, and notes from July and August 2020 reported she was doing well with this medication, her nausea and vomiting episodes controlled. October 2020 treatment notes also reported she was doing well, with no nausea or vomiting reported.  2021 notes indicated that she continued on medications, with no reports of significant limitations due to cyclic vomiting, the condition well controlled with Amitriptyline.  Later notes documented some vomiting "here and there," but contained no findings of significant limitations. (Tr. at 28.)

As for her kidney impairment, plaintiff underwent a renal transplant in April 2019, prior to her alleged onset date in May 2020.  In August 2020, Dr. Kumar reported that plaintiff's chronic kidney disease was stable, and subsequent 2020 treatment notes reported that she was doing well and contained no significant functional limitations.  (Tr. at 28.)  Notes from 2021 continued to report that plaintiff was doing well overall, with no reports of significant functional limitations due to her kidney condition.  She did undergo a kidney biopsy due to rising creatinine, but she was otherwise noted to be doing well and (aside from a temporary lifting restriction after the biopsy) the notes documented no findings or reports of significant kidney functional limitations, including immunosuppression limitations.  October 2021 notes reported deterioration in renal function due to poor glycemic control, with providers advising she must achieve excellent glycemic control to preserve her graft function, but these notes also contained no findings or reports of significant functional limitations, including immunosuppression

16

limitations. (Tr. at 29.)

Plaintiff had also been diagnosed with type I diabetes, with notes documenting treatment with insulin and Metformin. However, treatment notes consistently reported that she was doing well overall, with no findings of significant functional limitations due to diabetes. July 2021 notes documented a change in plaintiff's medications, but these notes and subsequent ones did not reflect serious diabetes related functional limitations. (Tr. at 29.)

Plaintiff had also been diagnosed with coronary artery disease, status post myocardial infarction, and hypertension, but these conditions appeared to be stable, and the treatment notes suggested no related functional limitations. (Tr. at 30.) As for plaintiff's obstructive sleep apnea, she reported improved sleep quality with CPAP treatment, and the treatment notes contained no findings or reports of significant related limitations. (Tr. at 30-31.) Finally, plaintiff was obese, with a BMI over 40, but the treatment notes contained no findings of significant functional limitations related to obesity, and providers encouraged exercise. (Tr. at 31.)

The ALJ concluded that while the record contained evidence demonstrating that plaintiff had limitations, plaintiff's statements about the intensity, persistence, and limiting effects of her symptoms were inconsistent with other evidence of record during the period under review. The ALJ stressed plaintiff's September 2021 report of improved sleep quality, which was inconsistent with her reports of excessive daytime sleepiness, as well as the 2021 records documenting improvement in her nausea and vomiting. (Tr. at 31.) The ALJ also highlighted plaintiff's testimony that her medical providers had not supplied a cause for her shortness of breath; that she had not undergone any recent cardiological treatment; and that her diabetic condition had improved with a combination of increased physical activity, medications, and healthy diet, and her nausea and vomiting had improved with Amitriptyline. (Tr. at 31-32.)

17

"Thus, the evidence reflects that the claimant, at least in some cases, has either not pursued or received treatment for certain alleged symptoms or conditions. In addition, the evidence reflects that the claimant's condition has, in some respects, according to her own testimony, improved during the period under review." (Tr. at 32.)

The ALJ also determined that plaintiff's activities were not as limited as one might expect given her allegations of disabling symptoms. Plaintiff testified that she could perform some limited activities, such as personal care, assisting her husband cooking, periodically doing dishes or laundry at a reduced pace, shopping with a scooter, and doing limited driving. In her most recent function report, plaintiff indicated that she could prepare simple meals, do housework such as dishes and laundry, drive a car, and engage in social activities like going to church and attending sporting events. "Such a range of ADLs supports the conclusion that the claimant retained significant overall functional capacity during the period under review, consistent with the RFC provided herein." (Tr. at 32.)

As for the medical opinions, the ALJ found unpersuasive Dr. Chan's finding that plaintiff could perform light work, with no other limitations, concluding that the record as a whole supported a sedentary RFC with additional postural and environmental restrictions. (Tr. at 32-33.) The ALJ found somewhat persuasive Dr. Lipski's limitation to sedentary work with postural and environmental restrictions, but discounted the doctor's further limitation to frequently lifting/carrying less than 10 pounds, as the evidence supported the conclusion that plaintiff could lift and carry at the sedentary level. (Tr. at 33.)

The ALJ found unpersuasive the various opinions from Dr. Kumar, plaintiff's primary care physician. In December 2019, Dr. Kumar provided a temporary off work restriction. This restriction was provided six months before the alleged onset date, and the ALJ found it

18

unpersuasive in demonstrating plaintiff's ongoing, overall functional capacity, as it was meant to be temporary and contained no function-by-function assessment. (Tr. at 33.) In January 2020, Dr. Kumar opined that plaintiff was permanently and completely disabled due to her impairments, but this restriction also pre-dated the alleged onset date. (Tr. at 33-34.) The ALJ further found this opinion unpersuasive, as it was conclusory, contained no function-by-function assessment, and opined on an issue reserved to the Commissioner. (Tr. at 34.) In May 2020, Dr. Kumar opined plaintiff was completely disabled and needed an excuse to stay off work until the next visit. While these opinions were provided during the relevant period, the ALJ found them unpersuasive, as they were conclusory, contained no detailed function-by-function assessments, and opined on an issue reserved to the Commissioner. Additionally, Dr. Kumar noted in November 2020 that plaintiff was doing good overall, with no bad nausea or vomiting episodes the last few weeks. (Tr. at 34.) In June 2020, Dr. Kumar opined plaintiff was completely disabled due to her impairments, symptoms, and frequent hospitalizations. Again, while these opinions were provided during the relevant period, they were also conclusory, contained no detailed function-by-function assessment, opined on an issue reserved to the Commissioner, and conflicted with Dr. Kumar's later treatment notes. (Tr. at 34.)

In sum, the ALJ found the RFC supported by the medical evidence, as well as the other evidence of record, including plaintiff's hearing testimony. While the record did not support plaintiff's allegations of disabling symptoms, the ALJ accounted for the combined effects of plaintiff's impairments by restricting her to sedentary work with postural and environmental limitations. (Tr. at 34.)

At step four, the ALJ found plaintiff capable of performing her past relevant work as a personnel clerk, as generally done. (Tr. at 34-35.) In the alternative, the ALJ determined at

19

step five that plaintiff could perform other jobs, as identified by the VE, including document preparer, ink printer, and hand mounter. (Tr. at 35-36.) The ALJ accordingly found plaintiff had not been under a disability from May 9, 2020, through the date of decision. (Tr. at 36.)

On September 20, 2022, the Appeals Council denied plaintiff's request for review (Tr. at 6), making the ALJ's decision the final word from the agency. See Jozefyk v. Berryhill, 923 F.3d 492 (7th Cir. 2019). This action followed.

## II. DISCUSSION

### A. Standard of Review

The court will uphold an ALJ's decision to deny benefits if it uses the correct legal standards, is supported by substantial evidence, and contains an accurate and logical bridge from the evidence to the conclusions. Jeske v. Saul, 955 F.3d 583, 587 (7th Cir. 2020). "Substantial evidence" is not a high threshold, as it means only such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Bakke v. Kijakazi, 62 F.4th 1061, 1066 (7th Cir. 2023). The court will not, under this deferential standard, re-weigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute its judgment for that of the ALJ, and will reverse only if the record compels a contrary result. Deborah M. v. Saul, 994 F.3d 785, 788 (7th Cir. 2021). Moreover, an ALJ's adequate discussion of the issues need not contain a complete written evaluation of every piece of evidence. Id. In other words, an ALJ need not in building the required bridge discuss every piece of evidence in the record and is prohibited only from ignoring an entire line of evidence that supports a finding of disability. Id. Finally, principles of administrative law require the ALJ to rationally articulate the grounds for his decision and confine judicial review to the reasons

20

supplied by the ALJ.  <u>Steele v. Barnhart</u>, 290 F.3d 936, 941 (7th Cir. 2002) (citing <u>SEC v. Chenery Corp.</u>, 318 U.S. 80, 93-95 (1943)).  However, the court need not remand a case for further specification where it is clear that the ALJ would reach the same result.  <u>McKinzey v. Astrue</u>, 641 F.3d 884, 892 (7th Cir. 2011).

**B.    Plaintiff's Arguments**

Plaintiff notes that the state agency initially found that she met the criteria for Listing 6.04, resulting in a closed period of disability.  However, this finding was overturned because of her return to work.  Plaintiff complains that neither the agency nor the ALJ considered whether this work attempt fell within the definition of a trial work period. (Pl.'s Br. at 3.)  Plaintiff further contends that she experienced a severe decline in functioning after the trial work period, with symptoms of uncontrolled nausea and vomiting, as well as severe fatigue and swelling related to her uncontrolled diabetes. (Pl.'s Br. at 3-4.)  She argues that the ALJ erroneously evaluated her statements regarding the severity of her symptoms, the medical opinions of her treating physician and the consultative examiner, and the combined effects of her impairments. I consider each of her arguments in turn.

**1.    Listing 6.04/Trial Work Period**

"In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." <u>Barnett v. Barnhart</u>, 381 F.3d 664, 668 (7th Cir. 2004).  As indicated above, in the present case the ALJ stated that he considered plaintiff's:

> kidney impairments under the various sections of listing 6.00 (Genitourinary Disorders – Adult).  During the period under review, the evidence supports the conclusion that the claimant's impairments do not satisfy the criteria of any of the sections of the listing.  The claimant's kidney condition is discussed further below.

(Tr. at 25.)

Plaintiff argues that this conclusory statement fails to satisfy Seventh Circuit standards. (Pl.'s Br. at 5.) She further argues that the ALJ overlooked her lawyer's argument regarding Listing 6.04 and a trial work period, as well as the agency reviewing physician's initial finding of disability from April 2019 to April 2020 under Listing 6.04. (Pl.'s Br. at 5-6.) She contends that SSR 96-6p required the ALJ to consider the agency consultant's finding,[1] and that remand is required under Tumminaro, 671 F.3d at 633, because the ALJ ignored her entitlement to a trial work period. (Pl.'s Br. at 7.) She concludes that because the ALJ never addressed these issues any defense is barred by the Chenery doctrine (Pl.'s Br. at 6-7), and she asks the court to find her disabled as of April 17, 2019, the beginning of her trial work period, with disability continuing after the end of the unsuccessful trial work period because she demonstrated no medical improvement (Pl.'s Br. at 8).

As summarized above, plaintiff's primary argument rests on a mistake of law. She was not entitled to a trial work period from August 2019 to May 2020 because she did not file her application until June 2020. See 20 C.F.R. § 404.1592(d)(2)(iv) ("You are not entitled to a trial work period. . . [f]or any month prior to the month of your application for disability benefits"); 20 C.F.R. § 404.1592(e) ("The trial work period . . . cannot begin before the month in which you file your application for benefits."); see, e.g., Heiberger v. Berryhill, No. 17 C 6858, 2018 U.S. Dist. LEXIS 131439, at *7 (N.D. Ill. Aug. 6, 2018):

> Ms. Heiberger also argues that her time at Bell School was not substantial gainful activity because it was an unsuccessful work attempt during a trial work period. A trial work period, however, cannot begin before the month the claimant filed the

[1]This Ruling was rescinded and replaced by SSR 17-2p effective March 27, 2017. https://www.ssa.gov/OP_Home/rulings/di/01/SSR96-06-di-01.html.

application for benefits. 20 C.F.R. § 404.1592(e). Here, Ms. Heiberger's five months at Bell School took place before she applied for benefits in 2013. Therefore, this time cannot be considered a trial work period.

Plaintiff was also not entitled to a trial work period because she performed work demonstrating the ability to engage in SGA during the five-month waiting period, 20 C.F.R. § 404.1592(d)(2)(ii), and because she performed work demonstrating the ability to engage in SGA within 12 months of onset and before a favorable determination, 20 C.F.R. § 404.1592(d)(2)(iii). Nor, as the agency recognized, was she entitled to a period of disability under Listing 6.04 because she returned to work at the SGA level in August 2019, just four months after her April 2019 transplant. See SSR 82-52, 1982 SSR LEXIS 19, at *5 ("When the return to work demonstrating ability to engage in SGA occurs before approval of the award and prior to the lapse of the 12-month period after onset, the claim must be denied.").

In reply, plaintiff completely ignores the Commissioner's explanation as to why she was not entitled to a trial work period (Def.'s Br. at 4-5), instead repeating her claim that any response is barred by the Chenery doctrine and that the matter must be remanded for payment of benefits under Listing 6.04 (Pl.'s Rep. Br. at 3, 4-5). The operative facts pertinent to this issue are undisputed,[2] and plaintiff offers no response on the merits of the legal issue.

_____

[2]At the very end of her reply brief, plaintiff asserts that "she was unable to even sustain accommodated employment due to her severe symptoms, after over 20 years of uninterrupted employment. (Tr. at 186-187)." (Pl.'s Rep. Br. at 12.) Plaintiff cites no evidence that her work from August 2019 to May 2020 was "accommodated," and she develops no argument that the work did not otherwise quality as SGA; the record pages she cites simply list her earnings. I doubt plaintiff intended this conclusory assertion as a challenge regarding the nature of this work. In any event, "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived," Crespo v. Colvin, 824 F.3d 667, 673 (7th Cir. 2016) (internal quote marks omitted); see also Gross v. Town of Cicero, Ill., 619 F.3d 697, 703 (7th Cir. 2010) (noting that courts need not consider factual assertions "that lack direct citation to easily identifiable support in the record"), as are arguments raised for the first time in reply, Brown v. Colvin, 661 Fed. Appx. 894, 895 (7th Cir. 2016) (citing Nationwide Ins. Co. v. Cent.

Accordingly, while the ALJ should have spelled this out in his decision, remand for that purpose would be pointless. See Ricketts v. AG United States, 955 F.3d 348, 352 (3rd Cir. 2020) ("Under S.E.C. v. Chenery Corp., 318 U.S. 80 (1943), a court will generally dispose of an administrative law case only on the grounds cited by the pertinent agency, but remand for further agency action is unnecessary when only one disposition is possible as a matter of law.") (internal quote marks omitted); Lopez v. Lynch, 810 F.3d 484, 492 (7th Cir. 2016) (noting that the "futility doctrine" is a recognized exception to Chenery); see also Karr v. Saul, 989 F.3d 508, 513 (7th Cir. 2021) ("[I]f the error leaves us convinced that the ALJ would reach the same result on remand, then the error is harmless and a remand is not required."); McKinzey, 641 F.3d at 892 ("[W]e will not remand a case to the ALJ for further specification where we are convinced that the ALJ will reach the same result."); Mueller v. Colvin, 524 Fed. Appx. 282, 285 (7th Cir. 2013) ("[T]he absence of a rationale may constitute harmless error if the agency's decision is overwhelmingly supported by the record and thus remand would be pointless."); Parker v. Astrue, 597 F.3d 920, 924 (7th Cir. 2010) (noting that harmless error is an exception to Chenery).

Nor would it make sense to remand so the ALJ can articulate his consideration of Dr. Braverman's August 2020 administrative findings. Dr. Braverman concluded that plaintiff was disabled from April 2019 to April 2020 based solely on Listing 6.04, a mistake the agency promptly corrected. It appears Dr. Braverman's assessment of plaintiff's RFC from April 2020 onward was the same as Dr. Chan's, which the ALJ considered but found unpersuasive because it overstated plaintiff's functioning. (Tr. at 81, 97.) And the ALJ evaluated plaintiff's

_____

Laborers' Pension Fund, 704 F.3d 522, 527 (7th Cir. 2013)).

24

functioning from May 2020 onward based on all of her impairments, including her chronic kidney disease, consistent with the terms of Listing 6.04.

In a footnote, plaintiff contends that her onset date clearly was April 17, 2019, despite the ALJ's attempts to convince the reader it must be May 2020, "ignoring the unsuccessful work attempt." (Pl.'s Br. at 6 n.5.) Plaintiff alleged an onset date of May 9, 2020 (Tr. at 177, 197, 207), and her lawyer never moved to amend it. Plaintiff develops no argument that her work from August 2019 to May 2020 was an "unsuccessful work attempt," nor could it be. See 20 C.F.R. § 404.1574(c)(4) ("We will not consider work you performed at the substantial gainful activity earnings level for more than 6 months to be an unsuccessful work attempt regardless of why it ended or was reduced below the substantial gainful activity earnings level."). In reply, plaintiff contends that the state agency amended her onset date to April 17, 2019, and the ALJ ignored this "legally binding finding," instead using an incorrect onset date of May 9, 2020. (Pl.'s Rep. Br. at 3.) However, plaintiff cites no authority for the proposition that an agency reviewer can amend a claimant's onset date in this fashion, see Program Operations Manual System (POMS) DI 25501.230(A) (noting that while a claimant may amend the AOD any time up to the date of the DDS determination, "under no circumstances will we persuade or require the claimant to amend his or her AOD"), or that such an agency reviewer action would legally bind the ALJ, see SSR 18-1p, 2018 SSR LEXIS 2, at *20 ("Generally, we may not determine a claimant's EOD to be before the last day that he or she performed SGA.").

Plaintiff's challenge to the ALJ's step three articulation also fails. First, the Seventh Circuit has made clear that courts may look to an ALJ's more thorough discussion of the evidence in the RFC section in reviewing the step three conclusion; this practice does not violate Chenery. Jeske, 955 F.3d at 589; see also Curvin v. Colvin, 778 F.3d 645, 650-51 (7th

Cir. 2015) ("This discussion provides the necessary detail to review the ALJ's step 3 determination in a meaningful way. We do not discount it simply because it appears elsewhere in the decision. To require the ALJ to repeat such a discussion throughout his decision would be redundant."). Thus, there is nothing wrong with what the ALJ said here—that he would discuss plaintiff's kidney condition in more detail in the RFC section.

Second, plaintiff makes no attempt to show that she meets any Listing other than § 6.04, which, for the reasons set forth above, does not apply during the period at issue. The Seventh Circuit has held that, even if the ALJ does not offer a sufficient step three analysis, the court need not remand if the claimant fails to show that she meets the criteria of a particular Listing. Sosinski v. Saul, 811 Fed. Appx. 380, 381 (7th Cir. 2020) (citing Jeske, 955 F.3d 589-91); Lloyd v. Berryhill, 682 Fed. Appx. 491, 496 (7th Cir. 2017).

As the Commissioner notes, in what appears to be a typographical error, plaintiff references Listing 6.03 in the heading to this section of her main brief. (Pl.'s Br. at 4; Def.'s Br. at 7 n.4.) In reply, plaintiff references Listing 6.04 in the heading. (Pl.'s Rep. Br. at 4.) In any event, plaintiff makes no attempt to show that she meets Listing 6.03, which requires the claimant undergo dialysis. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 6.03. The record contains no evidence that plaintiff did so during the period at issue. As summarized above, the ALJ thoroughly discussed plaintiff's treatment for kidney disease. Because plaintiff identifies no other Listing she believes she meets or equals (including Listing 6.09, referenced by her lawyer at the hearing (Tr. at 49)), any such argument is waived. See Crespo, 824 F.3d at 674 (holding that perfunctory and undeveloped arguments are waived).


**B.  Symptom Evaluation/Subjective Limitations**

26

In determining whether a claimant is disabled, an ALJ must consider all symptoms, including pain, and the extent to which those "symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a). SSR 16-3p sets forth a two-step process for symptom evaluation. First, the ALJ must determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p, 2016 SSR LEXIS 4, at *5. Second, if the claimant has such an impairment, the ALJ must evaluate the intensity and persistence of the symptoms to determine the extent to which they limit the claimant's ability to function. Id. at *9. If the statements are not substantiated by objective medical evidence, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms based on the entire record and considering a variety of factors, including the claimant's daily activities, medications used, and treatment received for relief of the symptoms. Id. at *18-19. "The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." Id. at *26. So long as the ALJ gives specific reasons supported by the record, the court will overturn his credibility determination only if it is "patently wrong." Deborah M., 994 F.3d at 788.

Plaintiff notes that at various points in the decision the ALJ relied on her daily activities, including in addressing her symptoms. (Pl.'s Br. at 8.) She argues that this type of reliance on simple daily activities to show a claimant is not disabled is not allowed in this Circuit. (Pl.'s Br. at 8-9.)

The Seventh Circuit has warned ALJs not to equate daily activities with the requirements

27

of a full-time job, e.g., Hill v. Colvin, 807 F.3d 862, 869 (7th Cir. 2015), and not to give undue weight to mundane tasks most people have to do for themselves, e.g., Hughes v. Astrue, 705 F.3d 276, 278-79 (7th Cir. 2013); see also Zurawski v. Halter, 245 F.3d 881, 887 (7th Cir. 2001) ("While the ALJ did list Zurawski's daily activities, those activities are fairly restricted (e.g., washing dishes, helping his children prepare for school, doing laundry, and preparing dinner) and not of a sort that necessarily undermines or contradicts a claim of disabling pain.").

But the court of appeals has also made clear that it is "it is entirely permissible to examine all of the evidence, including a claimant's daily activities, to assess whether testimony about the effects of [her] impairments was credible or exaggerated." Alvarado v. Colvin, 836 F.3d 744, 750 (7th Cir. 2016) (internal quote marks omitted); see also Crowell v. Kijakazi, 72 F.4th 810, 816 (7th Cir. 2023) (noting that agency regulations instruct ALJs to consider daily activities as part of the analysis). Courts have accordingly recognized the critical difference between an ALJ improperly saying, "the claimant can perform this range of activities, therefore she can work," and an ALJ reasonably saying, "the claimant can perform this range of activities, therefore she can do more than she claims." E.g., Olejnik v. Kijakazi, No. 21-C-1478, 2022 U.S. Dist. LEXIS 201146, at *48 (E.D. Wis. Nov. 3, 2022); see also Deborah M., 994 F.3d at 791 (affirming where the ALJ did not compare the claimant's activities to actual work situations but correctly looked at those activities to see if they corroborated her pain claims); Pepper v. Colvin, 712 F.3d 351, 369 (7th Cir. 2013) ("The ALJ concluded that, taken together, the amount of daily activities Pepper performed, the level of exertion necessary to engage in those types of activities, and the numerous notations in Pepper's medical records regarding her ability to engage in activities of daily living undermined Pepper's credibility when describing her subjective complaints of pain and disability.").

In the present case, the ALJ wrote:

> The claimant's activities, as reported in the record are not as limited as one might expect given the claimant's allegations of disabling symptoms. She testified that she is able to perform some limited ADLs, such as performing her personal care at a slower pace, feeding herself, watching TV, taking her medications, reading, assisting her husband with cooking dinner, periodically doing dishes or laundry at a reduced pace, going grocery shopping with her husband using a motorized scooter, and doing limited driving. In her most recent function report dated May 2021, the claimant reported that during the period under review she has been able to perform activities of daily living (ADLs) such as preparing simple meals, doing housework such as dishes and laundry, driving a car, going shopping in stores and by computer, handling money matters such as paying bills and using a checkbook, and engaging in social activities such as going to church and attending sporting events. Such a range of ADLs supports the conclusion that the claimant retained significant overall functional capacity during the period under review, consistent with the RFC provided herein.

(Tr. at 32, record citations omitted.) The ALJ did not equate plaintiff's activities to full-time work; rather, he found those activities inconsistent with plaintiff's claims of disabling symptoms.

While none of the ALJ's observations about plaintiff's activities necessarily defeated her claims, that sort of contradiction is not required. Olejnik, 2022 U.S. Dist. LEXIS 201146, at *42. As Judge Griesbach has explained:

> The ALJ is not required to cite conclusive evidence that a claimant is exaggerating his symptoms or lying in order to find his testimony insufficient to support his claim. Seldom, if ever, is conclusive evidence available in social security disability cases, or any other kind of case for that matter. Not many claimants, for example, describe daily activities that would be impossible to perform if they were truly disabled, and the Social Security Administration does not pay investigators to follow claimants around and see if they are really as functionally limited as they claim. Thus, instead of requiring conclusive evidence that a claimant is not telling the truth, the ALJ need only provide reasons based on the record as a whole why the claimant's testimony was not fully credited. The reasons provided by the ALJ must of course be logical, but they need not rule out any possibility that the claimant is truthful. Even in criminal cases where the burden of proof is beyond a reasonable doubt, conclusive evidence is not required to sustain the verdict.

Roovers v. Colvin, No. 14-C-370, 2015 U.S. Dist. LEXIS 8538, at *16-17 (E.D. Wis. Jan. 26,

2015).

Plaintiff further argues that the ALJ ignored evidence regarding the significant difficulty she had performing daily activities due to her impairments. (Pl.'s Br. at 9-10; Pl.'s Rep. Br. at 5.) Specifically, plaintiff contends that the ALJ overlooked evidence of her sleep apnea, shortness of breath, and fatigue, requiring daily naps; ignored the requirement that she elevate her feet multiple times during the day due to swelling, which would, the VE said, be work-preclusive; and misrepresented her ability to cook, do dishes, and clean, tasks generally done by her husband. (Pl.'s Br. at 10.)

The ALJ touched on most of this evidence in his decision. See Curvin, 778 F.3d at 650 (noting that it is proper for a court to read an ALJ's decision as a whole to ascertain whether he considered all of the relevant evidence, made the required determinations, and gave supporting reasons for his decisions). The ALJ summarized plaintiff's alleged symptoms, including shortness of breath, fatigue and sleepiness, and swelling of the feet and ankles (Tr. at 26-27), and discussed the related medical evidence, including notes documenting a good foot exam, no signs of edema in the extremities, no reports of significant limitations due to diabetic neuropathy (Tr. at 21), and no reports or findings of significant limitations related to sleep apnea (Tr. at 30-31), diabetes (Tr. at 29), obesity (Tr. at 31), or cardiovascular conditions (Tr. at 30). The ALJ further noted plaintiff's report of improved sleep quality with her CPAP and resolution of daytime sleepiness, which was inconsistent with her claim of excessive daytime sleepiness. (Tr. at 30-31.) The ALJ also noted that plaintiff's providers had not furnished a cause for her alleged shortness of breath, and she had not pursued treatment for that condition. (Tr. at 31.) While plaintiff mentioned an upcoming appointment with a cardiologist, the evidence of her past cardiac treatment contained no reports or findings of significant limitations. (Tr. at

30

31.) Plaintiff cites no medical evidence documenting severe shortness of breath, leg swelling, or a need to elevate her legs during the day, relying solely on her own subjective allegations.[3] Finally, as the block quote from the ALJ's decision set forth above makes clear, the ALJ acknowledged plaintiff's limitations in performing daily activities, e.g., that she helped her husband cook, and periodically did dishes and laundry at a reduced pace. The ALJ did not misrepresent plaintiff's activities, as she alleges. (Pl.'s Rep. Br. at 5-6.)

But even if the ALJ gave too much weight to plaintiff's daily activities, that was not the only reason he provided for discounting plaintiff's claims of disabling symptoms. The ALJ also cited the objective medical findings (Tr. at 27-31), the absence of treatment for certain alleged symptoms or conditions (Tr. at 32), plaintiff's improvement with the treatment she did receive (Tr. at 32), and her inconsistent statements to providers about fatigue (Tr. at 31). These are valid reasons for discounting a claimant's statements. See Summers v. Berryhill, 864 F.3d 523, 528 (7th Cir. 2017) (affirming ALJ's credibility determination where the claimant's allegations conflicted with her prior statements to medical providers); Molnar v. Astrue, 395 Fed. Appx. 282, 288 (7th Cir. 2010) ("[T]he ALJ was permitted to consider the effectiveness of treatment . . . in making her credibility determination."); Skinner v. Astrue, 478 F.3d 836, 845 (7th Cir. 2007) (affirming ALJ's credibility finding where "the record medical evidence established that

_____

[3]As indicated in the above summary of the medical evidence, plaintiff consistently denied—and her providers noted no indication of—shortness of breath or leg swelling (edema). (Tr. at 1048, 1051, 1055, 1061, 1062, 1075, 1139, 1143, 1160, 1165, 1210, 1288, 1294.) Plaintiff alleges that the ALJ also ignored her nervous tics and tremors in her hands (Pl.'s Br. at 10), but plaintiff testified that this occurred during a panic attack (Tr. at 64), and the ALJ found her alleged mental impairments non-severe, a finding plaintiff does not contest. Plaintiff cites no medical evidence of manipulative limitations, and the agency consultants found no such limitations. (Tr. at 97, 106.) See Gedatus v. Saul, 994 F.3d 893, 905 (7th Cir. 2021) ("Besides, she has not pointed to any medical opinion or evidence to show any tremors caused any specific limitations.").

31

those symptoms are largely controlled with proper medication and treatment"). Plaintiff fails to address these other grounds for the ALJ's credibility finding. See Halsell v. Astrue, 357 Fed. Appx. 717, 722-23 (7th Cir. 2009) ("Not all of the ALJ's reasons must be valid as long as enough of them are, see, e.g. Simila v. Astrue, 573 F.3d 503, 517 (7th Cir. 2009); Shramek v. Apfel, 226 F.3d 809, 811 (7th Cir. 2000), and here the ALJ cited other sound reasons for disbelieving Halsell.").[4]

## C. Medical Opinions

A "medical opinion" is a statement from a medical source about what the claimant can still do despite her impairments and whether she has impairment-related limitations in her ability to: perform the physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, or pulling; perform the mental demands of work activities, such as understanding, remembering, maintaining concentration, carrying out instructions, or responding appropriately to work pressures; and adapt to environmental conditions, such as temperature extremes or fumes. 20 C.F.R. § 404.1513(a)(2). A prior "administrative medical finding" is a finding about a medical issue made by agency medical and psychological consultants at a prior level of review. 20 C.F.R. § 404.1513(a)(5).

The ALJ will not defer or give any specific evidentiary weight, including controlling

---

[4]Resurrecting an issue I thought had been laid to rest, plaintiff complains in reply that the Commissioner failed to "warn" the court that Halsell is unpublished. (Pl.'s Rep. Br. at 5 n.3.) As I and other judges in this district have told plaintiff's counsel before, citation of unpublished decisions is permitted in this court; no special "warning" is required. (Case No. 20-C-732, R. 32, Commissioner sur-reply collecting decisions; R. 36 at 14, decision reiterating the point.) As he has also done in past cases, throughout the briefs plaintiff's counsel refers to the "decision writer" rather than the ALJ. (E.g., Pl.'s Br. at 1 n.2) Because plaintiff develops no argument that the involvement of these specialists in the decision-issuing process is unlawful or harmed her in any way, I do discuss the subject further.

weight, to any medical opinions or prior administrative medical findings, including those from the claimant's treating providers. 20 C.F.R. § 404.1520c(a). Instead, the ALJ will articulate how "persuasive" he finds all of the medical opinions and prior administrative medical findings in the case record. If a source provides multiple medical opinions or prior administrative medical findings, the ALJ will articulate how he considered such opinions together in a single analysis, using the regulatory factors. 20 C.F.R. § 404.1520c(b)(1). The factors of "supportability" (the more support the source offers, the more persuasive his opinion will be, 20 C.F.R. § 404.1520c(c)(1)) and "consistency" (the more consistent the opinion is with the other evidence, the more persuasive it will be, 20 C.F.R. § 404.1520c(c)(2)) are the most important in determining how persuasive the ALJ finds a source's medical opinions or prior administrative medical findings to be. 20 C.F.R. § 404.1520c(b)(1). Other factors include the source's relationship with the claimant, the source's specialization, and the source's familiarity with the other evidence in the claim record or an understanding of the disability program's policies and evidentiary requirements. 20 C.F.R. § 404.1520c(c). Statements on issues reserved to the Commissioner, such as whether the claimant is disabled or unable to perform regular and continuing work, are "inherently neither valuable nor persuasive to the issue of whether [the claimant is] disabled . . . under the Act," so the ALJ need not provide any analysis about how he considered such statements. 20 C.F.R. § 404.1520b(c).

Plaintiff complains that the ALJ rejected all of the opinions from Dr. Kumar, her primary care physician. (Pl.'s Br. at 11.) As summarized above, the ALJ considered Dr. Kumar's December 2019 statement temporarily excusing plaintiff from work and his January 2020, May 2020, and June 2020 statements deeming her "completely disabled." (Tr. at 33-34.) Although he was not required to do so, the ALJ considered each statement separately, noting that the

December 2019 statement was provided six months before the alleged onset date, was meant to be temporary, and contained no function-by-function assessment (Tr. at 33); that the January 2020 statement also pre-dated the alleged onset date, was conclusory, contained no function-by-function assessment, and opined on an issue reserved to the Commissioner (Tr. at 33-34); and that the May and June 2020 statements, while rendered during the relevant period, were also conclusory, contained no detailed function-by-function assessments, and opined on an issue reserved to the Commissioner (Tr. at 34). The ALJ further found the May and June 2020 opinions inconsistent with Dr. Kumar's November 2020 treatment note indicating that plaintiff was doing good overall, with no recent nausea or vomiting episodes. (Tr. at 34.) These are valid reasons for discounting a treating source opinion. See Crowell, 72 F.4th at 816 (affirming decision to give little weight to opinion because it was conclusory, rendered before the relevant period, intruded on an issue reserved to the Commissioner, and conflicted with subsequent records showing improvement with treatment); Pavlicek v. Saul, 994 F.3d 777, 781 (7th Cir. 2021) (holding that an ALJ may discount a treating physician's opinion when the opinion is inconsistent with the physician's treatment notes); Loveless v. Colvin, 810 F.3d 502, 507 (7th Cir. 2016) ("[T]he ALJ did not have to accept Dr. Cusack's October 2012 conclusory statement that Loveless could not work.").

The Commissioner contends that the ALJ was not required to discuss these statements at all under § 404.1520b(c)(3)(i), as opinions on issues reserved to the Commissioner (such as whether the claimant is disabled or unable to work) are "inherently neither valuable nor persuasive." (Def.'s Br. at 15.) In reply, plaintiff faults the Commissioner for failing to otherwise address her argument. (Pl.'s Rep. Br. at 6.) As discussed above, however, the ALJ provided several reasons for discounting Dr. Kumar's opinions, consistent with the regulatory factors.

34

Plaintiff wonders why the statements had to include a function-by-function analysis, when none of her impairments were musculoskeletal and her symptoms primarily impacted her ability to sustain a full-time work schedule. (Pl.'s Br. at 11-12.) She cites evidence that she wanted to return to work shortly after her transplant but that she was ultimately forced to stop due primarily to nausea/vomiting and related hospitalizations. (Pl.'s Br. at 12-13.) The ALJ discussed the evidence related to plaintiff's cyclic vomiting syndrome in some detail, noting her 10-day hospitalization in May 2020. (Tr. at 27.) Shortly thereafter, she started on Amitriptyline, on which she did well, her nausea and vomiting episodes controlled. (Tr. at 28.) Subsequent notes from Dr. Kumar and other providers reported that she continued to do well on this medication. (Tr. at 28.) Plaintiff also cites evidence that her diabetes was poorly controlled (Pl.'s Br. at 13), but the ALJ also discussed the records related to this condition, including a 2021 notation that the condition was uncontrolled (Tr. at 29). However, the treatment notes contained no findings or reports of significant diabetes-related limitations (Tr. at 29), and plaintiff cites no contrary medical evidence.

Plaintiff agrees the December 2019 statement was a temporary work excuse, but she contends that the December 2019 and January 2020 statements did relate to the relevant period because the proper onset date was April 17, 2019. (Pl.'s Br. at 14, 16.) As discussed above, that is incorrect.

Plaintiff also complains that the ALJ failed to quote the full text of Dr. Kumar's January 2020 treatment note in which he indicated that, due to her various impairments, which caused her to miss work related to surgeries and episodes of nausea and vomiting, he believed she was permanently and completely disabled and should apply for disability benefits. (Pl.'s Br. at 15, 16; Tr. at 379.) But as the ALJ noted, Dr. Kumar made this statement prior to the onset

35

date, and plaintiff's nausea/vomiting symptoms significantly improved in the latter half of 2020 and 2021. The ALJ also considered all of the conditions Dr. Kumar listed in this note; the ALJ was not required to find plaintiff disabled simply because she suffered from several different impairments. See Schmidt v. Barnhart, 395 F.3d 737, 746 (7th Cir. 2005) (rejecting the notion that symptoms associated with an impairment are automatically imputed to a claimant who suffers from that condition).

Plaintiff argues that the ALJ mis-characterized the May 2020 note, writing that she "needed a work excuse to stay off work until the next visit." (Pl.'s Br. at 15, quoting Tr. at 34.) Plaintiff contends that she desperately wanted to return to work and thus talked Dr. Kumar into providing her a return to work slip. (Pl.'s Br. at 15.) The ALJ did not mis-characterize this note. Dr. Kumar stated: "I gave her a return to work slip. She should not work until next visit." (Tr. at 368.) Plaintiff notes that Dr. Kumar believed she may need specialized treatment for her GI issues (Pl.'s Br. at 15, citing Tr. at 368), but the following month she saw Dr. Patel for management of nausea/vomiting, and he recommended Amitriptyline (Tr. at 407-08, 412), which significantly improved those symptoms (Tr. at 34).

Plaintiff argues that the ALJ omitted any discussion of Dr. Kumar's June 2020 opinions (Pl.'s Br. at 16), but that is simply wrong. The ALJ cited both statements regarding plaintiff's work capacity set forth in the June 10, 2020 note. (Tr. at 34, citing Tr. at 369, 375 and stating: "In June 2020, Dr. Kumar opined the claimant was completely disabled due to her impairments, symptoms, and frequent hospitalizations, and needed a work excuse."; see Tr. at 369: "Also, she is unable to work due to these frequent nausea and vomiting [sic], she needs a work excuse."' Tr. at 375: "I gave her a work excuse. I believe she is completely disabled due to multiple medical problems and frequent hospitalization.".)

36

Plaintiff also criticizes the ALJ's assessment of Dr. Juern's opinion. (Pl.'s Br. at 13.) As discussed above, the ALJ found unpersuasive Dr. Juern's conclusion that plaintiff could not return to work until her physical issues were under better control. The ALJ found the opinion conclusory, inconsistent with and unsupported by the evidence, and outside Dr. Juern's area of expertise. (Tr. at 24.) Plaintiff argues that the evidence supports a finding that she could not maintain full-time employment without excessive absences. (Pl.'s Br. at 13-14.) But as the ALJ discussed, in the latter half of 2020 plaintiff's symptoms improved and her episodes were greatly reduced after she started Amitriptyline. (Tr. at 32.) Plaintiff disagrees with the ALJ's conclusion, but a reviewing court may not re-weigh the evidence or substitute its judgment for the ALJ's. E.g., Deborah M., 994 F.3d at 788. Plaintiff complains that the ALJ did not address the fact that Dr. Juern was hired by the agency as an expert in the area of chronic pain and its effect on mental functioning. (Pl.'s Br. at 14.) The ALJ acknowledged that Dr. Juern performed a consultative exam for the agency (Tr. at 23), and plaintiff cites no evidence regarding Dr. Juern's specialty. In a footnote, she cites the American Psychological Association website section on how psychologists can help with pain management (Pl.'s Br. at 14 n.8), but this is not specific to Dr. Juern; in any event, plaintiff does not explain the significance of a speciality in pain when she primarily alleges disability due to fatigue and nausea. Moreover, the regulation specifically provides that, while the ALJ will explain how he considered the supportability and consistency factors, he may, but is not required to, explain how he considered the other factors, including specialization. 20 C.F.R. § 404.1520c(b)(2). Plaintiff cites White v. Barnhart, 415 F.3d 654 (7th Cir. 2005), but that case hurts rather than helps her cause. (Pl.'s Br. at 14.) The Seventh Circuit stated:

Dr. Steiner is a physiatrist; physiatrists are experts in diagnosing and treating

37

> acute and chronic pain and musculoskeletal disorders.  The ALJ credited Dr.
> Steiner's opinion to the extent that it related to his specialty—White's residual
> functional capacity in light of his physical ailments—and discounted Dr. Steiner's
> opinion when he strayed from his area of expertise and opined that White had a
> psychiatric disorder.  This was a reasonable way to distinguish among Dr.
> Steiner's opinions.

Id. at 660.  Here, the source was a psychologist, with expertise in mental impairments, yet he based his opinion on plaintiff's physical impairments.

Plaintiff further contends, in this section of her briefs, that the ALJ failed to properly consider her vomiting impairment and diabetes.  (Pl.'s Br. at 17-20; Pl.'s Rep. Br. at 6-7.)  She argues that, while the ALJ found cyclic vomiting syndrome to be a severe impairment, he did not assess the duration of the impairment and the effect of this impairment on her ability to sustain full-time employment for the one-year period after her kidney transplant on May 17, 2018 [sic].  (Pl.'s Br. at 17.)

As the Commissioner notes, by finding the impairment "severe" the ALJ necessarily found that it persisted for 12 months; the more important question is whether plaintiff's impairments prevented her from working for at least 12 months.  (Def.'s Br. at 10.)  Plaintiff insists that the 12-month period began with the date of her transplant (which was April 17, 2019; the reference to May 17, 2018, is ostensibly a typo), but as discussed above, the relevant period started on May 9, 2020.  Thus, while plaintiff cites evidence of vomiting and nausea after the April 2019 transplant, culminating in a 10-day hospital stay in May 2020 (Pl.'s Br. at 18), this evidence is of limited relevance.  In any event, the ALJ acknowledged plaintiff's intractable vomiting and nausea following the transplant and the 10-day hospitalization in May 2020.  (Tr. at 27.)

Plaintiff states that Dr. Kumar relied on these symptoms in finding that she could not

38

sustain full-time employment (Pl.'s Br. at 19), but the ALJ noted that plaintiff's symptoms significantly improved after she started on Amitriptyline in June 2020 (Tr. at 28), as Dr. Kumar himself acknowledged in later treatment notes (Tr. at 34, 1139). See Skinner, 478 F.3d at 846 ("Contrary to any claim of severity, the ALJ concluded that at best Skinner had demonstrated nondisabling symptoms, and the record medical evidence established that those symptoms are largely controlled with proper medication and treatment."). As the ALJ further noted, at the November 2021 hearing plaintiff admitted that she had not gone to the hospital related to these issues in nearly a year. (Tr. at 32, 67.) Plaintiff cites no medical evidence demonstrating that her cyclic vomiting syndrome caused significant limitations during the period at issue.

Plaintiff states that she had "many hospitalizations" in 2020 for gastroparesis and a kidney biopsy (Pl.'s Br. at 19, citing Tr. at 1286, 1288, 1296, 1412, 1424, 1452, 1467, 1552), but this evidence does not support her claim during the period at issue. Transcript page 1286 discusses plaintiff's 9/29/21 kidney biopsy. Page 1288, part of same note, in the history section references plaintiff's re-admissions on 4/29/19 and 5/17/19 and multiple local ER visits for gastroparesis; she started on Zyprexa in December 2019, feeling better; further follow up determined she more likely had CVS. Page 1296 is also part of this note. Page 1412 documents the 8/18/21 creatinine test preceding the biopsy. Page 1424 is a 7/28/21 UW follow up note, the relevance of which is unclear. Page 1452 is a UW note from 7/22/21, which the ALJ quoted, where plaintiff reported she had been nauseous and had some vomiting, "not much, a couple days here and there." Plaintiff did not report recent ER/hospital visits in her response to a query from a nurse. Page 1467 documents 7/20/21 UW lab results, and page 1552 relates to an annual physical on 7/15/21.

Plaintiff next contends that the ALJ ignored evidence that in 2021 her diabetes became

39

uncontrollable. (Pl.'s Br. at 19-20; Pl.'s Rep. Br. at 7.) That is incorrect. (See Tr. at 29, "September 2021 treatment notes indicate that the claimant continued to carry a diagnosis of diabetes in the medical records, that was found to be uncontrolled in September 2021.".) Plaintiff includes a lengthy quote from Ms. Burmesch's March 2021 treatment note (Pl.'s Br. at 19-20; Pl.'s Rep. Br. at 7, citing Tr. at 1570, 1572), but as the ALJ wrote, subsequent notes indicated that plaintiff's A1C was improving, and these notes contained no findings or reports of significant diabetes-related limitations (Tr. at 29, citing Tr. at 1540, 1288). Plaintiff notes that her providers listed a number of other severe conditions (Pl.'s Br. at 20; Pl.'s Rep. Br. at 7), but the ALJ considered these impairments, and plaintiff cites no evidence of related limitations. See Weaver v. Berryhill, 746 Fed. Appx. 574, 579 (7th Cir. 2018) ("It was Weaver's burden to establish not just the existence of the conditions, but to provide evidence that they support specific limitations affecting her capacity to work."); Gentle v. Barnhart, 430 F.3d 865, 868 (7th Cir. 2005) ("The social security disability benefits program is not concerned with health as such, but rather the ability to engage in full-time employment. A person can be depressed, anxious, and obese yet still perform full-time work."); Schmidt, 395 F.3d at 746 (affirming where there was no objective support in the medical records for the claimant's contention that he suffered from impairment-related fatigue).

Finally, plaintiff develops no argument that the ALJ erred in crediting Dr. Lipski's opinion. The ALJ was permitted to rely on this evidence in concluding that plaintiff could, despite Dr. Kumar's assertion of complete disability, sustain a range of full-time, sedentary work. See Ketelboeter v. Astrue, 550 F.3d 620, 625 (7th Cir. 2008) (holding that an ALJ may discount a treating physician's opinion if it is inconsistent with a consulting physician's opinion).

40

**D.  Impairments in Combination**

"When determining a claimant's RFC, the ALJ must consider the combination of all limitations on the ability to work, including those that do not individually rise to the level of a severe impairment."  Denton v. Astrue, 596 F.3d 419, 423 (7th Cir. 2010).  Here, the ALJ limited plaintiff to a reduced range of sedentary work "to account for the combined effects of [her] physical impairments."  (Tr. at 34.)  Plaintiff argues this was insufficient (Pl.'s Br. at 20-21; Pl.'s Rep. Br. at 7), but it is unclear what further articulation was needed to demonstrate that the ALJ understood this requirement.  (See also Tr. at 21: "The undersigned considered all of the claimant's impairments, including those that are not severe, when the assessing the claimant's residual functional capacity.".)

Plaintiff contends that the most glaring omission from the RFC assessment was the failure to consider the impact of her multiple severe impairments on her ability to maintain attendance in a full-time job.  (Pl.'s Rep. Br. at 8.)  She contends that the record contains numerous medical opinions addressing limitations on her ability to sustain full-time work without excessive absences, which were ignored in the decision.  (Pl.'s Rep. Br. at 8, citing Pl.'s Br. at 12-13, 15-17.)

"ALJs need not comment on every line of every physician's treatment notes, as [plaintiff's] lawyer supposes; it is enough to recognize and respond to the physician's principal conclusions, which the ALJ did."  Kolar v. Berryhill, 695 Fed. Appx. 161, 161-62 (7th Cir. 2017).  As discussed in the preceding section, the ALJ specifically addressed Dr. Kumar's statements regarding plaintiff's ability to work.  The other evidence upon which plaintiff relies regarding the severity and unpredictability of her symptoms pertains almost entirely to the period before the alleged onset date.  (See Tr. at 377, 2/24/20 note; Tr. at 379, 1/14/20 note; Tr. at 380, 12/3/19

41

note; Tr. at 384-85, 11/27/19 note; Tr. at 408, 6/3/20 note from Dr. Patel discussing her history

after the transplant; Tr. at 414, 5/21/20 note, just after plaintiff's hospital discharge; Tr. at 435,

10/21/19 note; Tr. at 523, 5/21/19 note; Tr. at 545, 5/24/19 note; Tr. at 1029-34, documenting

plaintiff's statements to the consultative examiner about her termination and desire to return to

work.) And as also discussed above, the ALJ acknowledged the evidence of intractable nausea

and vomiting after the transplant, with a 10-day hospitalization in May 2020. (Tr. at 27.) But

plaintiff's symptoms improved once she started on Amitriptyline in June 2020 (Tr. at 28), and

plaintiff cites no medical evidence compelling a finding that she could not thereafter maintain

full-time work.

Plaintiff further argues that the ALJ failed to adequately account for her obesity, but she

quotes only the first two sentences of the ALJ's analysis (Pl.'s Br. at 21; Pl.'s Rep. Br. at 8-9),

giving the impression that the ALJ merely acknowledged the impairment without discussing its

functional impact. The ALJ wrote:

> The claimant is obese. 2021 medical notes reflect that she was measured at
> about 5 feet, 9 inches tall, weighed at 294 pounds, and had a body mass index
> of 42.8. At the hearing she testified that she is 5 feet, 7 inches tall, and weighs
> 275 pounds, giving her a body mass index of 43.1. However, October 2020
> treatment notes of Barbara Peschong, M.D., contain no findings of significant
> functional limitations related to obesity. Furthermore, the notes reflect that Dr.
> Peschong encouraged the claimant to engage in regular exercise and use of
> vitamins. U.W. Health medical notes from October 2020 also indicate that the
> claimant was reported to be doing well. March 2021 treatment notes of Irina
> Ionova, M.D., reflect that the claimant was reported to be doing well overall, with
> no reports of significant functional limitations due to obesity. September 2021
> treatment notes indicate that the claimant continued to carry a diagnosis of
> obesity in the medical records. However, these treatment notes contain no
> findings or reports of significant obesity related limitations.

(Tr. at 31, internal record citations omitted.)

Plaintiff contends that "the decision appears to attempt to deceive the reader because

42

higher BMIs were found in the record that were well over 44." (Pl.'s Br. at 21; Pl.'s Rep. Br. at 9.) But ALJs are not required to discuss every piece of evidence in the record, and plaintiff fails to explain why a BMI of 44 would compel a disability finding when 43 would not. See Deborah M., 994 F.3d at 788 (noting that an ALJ need not discuss every piece of evidence in the record and is prohibited only from ignoring an entire line of evidence that supports a finding of disability).

Plaintiff also faults the ALJ for failing to discuss her significant weight loss subsequent to the kidney transplant (Pl.'s Br. at 21; Pl.'s Rep. Br. at 9, citing Tr. at 573), but the note she cites is from May 2019, one year prior to the alleged onset date; she cites no evidence and develops no argument that weight loss was a problem during the period at issue. The ALJ did not commit reversible error by failing to cite this evidence. See Deborah M., 994 F.3d at 788.

Plaintiff next argues that the ALJ's finding that her obesity could be accommodated by a limitation to sedentary work contradicts binding caselaw. (Pl.'s Br. at 21-22; Pl.'s Rep. Br. at 9-10, citing Martinez v. Astrue, 630 F.3d 693, 688-89 [sic] (7th Cir. 2011).) The quote she attributes to Martinez actually comes from another case—Browning v. Colvin, 766 F.3d 702, 707 (7th Cir. 2014)—but regardless, the Seventh Circuit has never held that obese people cannot sustain even sedentary work. The problem in Browning was that neither the ALJ nor the consulting agency physician considered the potential impact of the claimant's obesity on her ability to sit for long periods of time, 766 F.3d at 707, which did not happen here. As discussed above, the ALJ reviewed the treatment records, finding no reference to limitations related to obesity (Tr. at 33), and Dr. Lipski specifically considered this impairment in finding that plaintiff could sustain a range of sedentary work, including the required sitting (Tr. at 106). Plaintiff cites no medical evidence or opinion that her obesity precludes sedentary work or

43

otherwise compels additional limitations.[5]  See Prochaska v. Barnhart, 454 F.3d 731, 737 (7th Cir. 2006) ("Because Prochaska failed to specify how [her] obesity further impaired [her] ability to work, and because the record relied upon by the ALJ sufficiently analyzes her obesity, any error on the ALJ's part was harmless.") (internal quote marks omitted); Skarbek v. Barnhart, 390 F.3d 500, 504 (7th Cir. 2004) (affirming where the claimant did not specify how his obesity further impaired his ability to work, and the ALJ adopted the limitations suggested by the specialists and reviewing doctors, who were aware of the claimant's obesity); see also SSR 02-1p, 2002 SSR LEXIS 1, at *15 ("[W]e will not make assumptions about the severity or functional effects of obesity combined with other impairments.  Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment.  We will evaluate each case based on the information in the case record.").

Plaintiff next contends that the "uncontradicted evidence of record indicates that [she] is unable to sit for more than short periods without elevating her" legs, a requirement the VE said was work preclusive.  (Pl.'s Br. at 22; Pl.'s Rep. Br. at 10.)  But the only evidence plaintiff cites in support of this requirement is her own testimony, which the ALJ did not fully accept; she cites no medical evidence or opinion imposing such a limitation.  See Weaver, 746 Fed. Appx. at 579 ("It was Weaver's burden to establish not just the existence of the conditions, but to provide evidence that they support specific limitations affecting her capacity to work."); Best v. Berryhill, 730 Fed. Appx. 380, 382 (7th Cir. 2018) ("There is no error when there is 'no doctor's opinion contained in the record [that] indicated greater limitations than those found by the

_____

[5]Earlier in her brief, plaintiff states that exams noted extreme obesity and "proximal muscle atrophy due to her inability to stand and walk."  (Pl.'s Br. at 19.)  The note she cites documents a BMI of 42 and proximal muscle atrophy, but it does not link the two; more importantly, the note says nothing about inability to stand and walk.  (Tr. at 1569.)

44

ALJ.'") (quoting Rice v. Barnhart, 384 F.3d 363, 370 (7th Cir. 2004)).  Contrary to plaintiff's suggestion, the ALJ did not accept the requirement that she elevate her legs to avoid swelling (Pl.'s Br. at 22; Pl.'s Rep. Br. at 10, citing Tr. at 27); rather, he noted plaintiff's allegation that she needed to do so.  Thus, there is no need to remand so the ALJ can explain how plaintiff could perform sedentary work with the requirement that she regularly elevate her legs.[6]  (See Pl.'s Br. at 22, 24.)  Nor it is necessary to remand so a medical expert can address the combined effects of obesity, diabetes, and edema on plaintiff's ability to perform sedentary work.  (Pl.'s Br. at 22; Pl.'s Rep. Br. at 10.)  Dr. Lipski considered all of the relevant impairments (Tr. at 106) and found that plaintiff could sit as required for sedentary work (Tr. at 105).

Plaintiff further argues that the ALJ failed to consider evidence of diabetic neuropathy, which caused excessive fatigue, swollen and painful joints, and weakness and tingling in her hands and feet, requiring the use of compression gloves and stockings.  (Pl.'s Br. at 22-23, citing Tr. at 34, 795, 803-805.)  The Commissioner responds that she searched the record and found no such evidence.  (Def.'s Br. at 11-12, 18.)  It appears plaintiff's counsel lifted this passage near verbatim, including the record citations, from a brief he filed in another case I recently decided.  (Case No. 22-C-1202, R. 9 at 14-15 [Pl.'s Br. at 13-14].)  The Commissioner suggested plaintiff clarify the issue in reply (Def.'s Br. at 18), but rather than admitting an

_____

[6]As indicated above, the medical records consistently noted no leg edema (Tr. at 1048, 1055, 1062, 1075, 1143, 1165, 1210, 1288), and as far as I can tell no doctor said plaintiff had to elevate her legs.  While it is true the VE found such a requirement work preclusive (see Pl.'s Br. at 23, 24; Pl.'s Rep. Br. at 11), he did so in response to the ALJ's hypothetical question (Tr. at 74); he was not offering testimony on plaintiff's limitations.  See Bolin v. Saul, No. 20-cv-348-jdp, 2021 U.S. Dist. LEXIS 27940, at *17 (W.D. Wis. Feb. 16, 2021) ("A hypothetical is not itself evidence; it is simply a question that the ALJ asks the vocational expert before the ALJ has determined what the evidence is.  So too, the vocational expert's answers that Bolin cites aren't evidence of her limitations.").

oversight or incautious block and copy from another brief, plaintiff simply repeats the claim (Pl.'s Rep. Br. at 10-11). Plaintiff also cites no evidence from her case record of "documented hand use limitations" (Pl.'s Br. at 23), and I have found none. Similarly, plaintiff's demand that the matter be remanded to address the combination of her diabetic leg swelling and "lumbar impairment" fails because, as far as I can tell, the record documents no lumbar impairment. (Pl.'s Br. at 24.) Again, despite the Commissioner's invitation that plaintiff clarify these claims in reply (Def.'s Br. at 18), plaintiff simply repeats them with no explanation or record support (Pl.'s Rep. Br. at 11, "documented hand use limitations"; Pl.'s Rep. Br. at 12, "lumbar impairment"). This sort of litigation tactic cannot possibly succeed. See Malin v. Hospira, Inc., 762 F.3d 552, 564 (7th Cir. 2014) (criticizing litigation strategy based on hope that the court will not take the time to check the record).

Plaintiff contends that her case is like Barrett v. Barnhart, 355 F.3d 1065, 1068-69 (7th Cir. 2004), where the court remanded a decision finding the claimant capable of light work, despite her obesity and arthritic knees. (Pl.'s Br. at 24; Pl.'s Rep. Br. at 12.) But in this case the ALJ limited plaintiff to sedentary work, and plaintiff does not allege a knee impairment. Plaintiff's claim that the ALJ made no attempt to even discuss the cumulative effects of her impairments is wrong, as indicated above. (Pl.'s Br. at 24; Pl.'s Rep. Br. at 12.) While plaintiff believes the ALJ should have reached a different conclusion, the court may not re-weigh the evidence and substitute its judgment. Crowell, 72 F.4th at 818 ("Crowell's arguments amount to disagreements with the administrative law judge's conclusions, and we decline her invitation to reweigh the evidence."). Plaintiff fails to show that the evidence compelled the inclusion of additional limitations. See Gedatus, 994 F.3d at 905 ("She bears the burden to prove she is disabled by producing medical evidence. Yet she failed to show how her medically determinable

46

impairments caused any limitations beyond those the ALJ found.") (internal citation omitted).

In reply, plaintiff accuses the Commissioner of attempting to change the burden of proof to her, when the burden was on the ALJ to consider the combination of all impairments on the ability to work. (Pl.'s Rep. Br. at 8.) While the substantial evidence standard applicable on judicial review requires the ALJ to minimally articulate his reasons, e.g., Crowell, 72 F.4th at 816, it does not shift the burden to the ALJ to prove that the claimant is able to work. See Vang v. Saul, 805 Fed. Appx. 398, 401-02 (7th Cir. 2020) ("True, the ALJ did not point to evidence that Vang could perform light work. The ALJ did, however, weigh the evidence and conclude that the record did not support a determination that Vang could not work. Ultimately, it was Vang's burden, not the ALJ's, to prove that he was disabled.") (citing Summers, 864 F.3d at 527). As discussed above, in this case the ALJ acknowledged his obligation to consider all impairments, severe and non-severe, in determining RFC, and he found that plaintiff failed to produce medical evidence proving disability. See Gedatus, 994 F.3d at 905.

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is affirmed, and this case is dismissed. The clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 24th day of August, 2023.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge

47